No. 22-30303

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF LOUISIANA, STATE OF ARIZONA, STATE OF MISSOURI, STATE OF WEST VIRGINIA, STATE OF SOUTH CAROLINA, *et al.*,

Plaintiffs-Appellees,

v.

CENTERS FOR DISEASE CONTROL AND PREVENTION, ROCHELLE WALENSKY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants-Appellants,

INNOVATION LAW LAB,

Movant-Appellant.

On Appeal from the United States District Court
for the Western District of Louisiana

### BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

BRANDON B. BROWN
*United States Attorney*

SHARON SWINGLE
JOSHUA DOS SANTOS
*Attorneys, Appellate Staff
Civil Division, Room 7224
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-5744*

## CERTIFICATE OF INTERESTED PERSONS

*Louisiana, et al. v. Centers for Disease Control and Prevention, et al.*, No. 22-30303

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of these appeals.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Plaintiffs-appellants:

Louisiana, Arizona, Missouri, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Kansas, Kentucky, Mississippi, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Utah, Virginia, West Virginia, Wyoming

Defendants-appellees:

Centers for Disease Control & Prevention
Rochelle Walensky, in her official capacity as Director of the Centers for Disease Control & Prevention
U.S. Department of Health & Human Services
Xavier Becerra, in his official capacity as Secretary of Health and Human Services
U.S. Department of Homeland Security
Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security
U.S. Customs & Border Protection
Christopher Magnus, in his official capacity as Commissioner of U.S. Customs and Border Protection
U.S. Immigration & Customs Enforcement
Tae Johnson, in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement
U.S. Citizenship & Immigration Services
Ur Jaddou, in her official capacity as Director of U.S. Citizenship and Immigration Services
U.S. Border Patrol
Raul Ortiz, in his official capacity as Chief of the U.S. Border Patrol
U.S. Department of Justice

Merrick Garland, in his official capacity as Attorney General of the United States of America
Executive Office for Immigration Review
David Neal, in his official capacity as Director of the Executive Office for Immigration Review
Joseph R Biden, Jr, in his official capacity as President of the United States
United States of America

Proposed Intervenor-appellant:

Innovation Law Lab

Counsel:

For plaintiffs-appellants:

Elizabeth Baker Murrill, Solicitor General
Joseph Scott St John, Deputy Solicitor General
*Louisiana Attorney General's Office, Louisiana Department of Justice*

Mark Brnovich, Attorney General
Brunn ("Beau") W. Roysden III, Solicitor General
Drew C. Ensign, Deputy Solicitor General
James K. Rogers, Senior Litigation Counsel
Anthony R. Napolitano, Assistant Attorney General
*Office of the Arizona Attorney General*

Eric S. Schmitt, Attorney General
D. John Sauer, Solicitor General
Michael E. Talent, Deputy Solicitor General
*Office of the Missouri Attorney General*

Daniel Cameron, Attorney General
Marc Manley, Associate Attorney General
*Kentucky Office of the Attorney General*

Ken Paxton, Attorney General
Aaron F. Reitz, Deputy Attorney General for Legal Strategy
Leif A. Olson, Special Counsel
*Office of the Attorney General of Texas*

Drew H. Wrigley, Attorney General
Matthew Sagsveen, Solicitor General
*Office of the North Dakota Attorney General*

Derek Schmidt, Attorney General
Dwight R. Carswell, Deputy Solicitor General
*Office of the Kansas Attorney General*

Austin Knudsen, Attorney General
David M.S. Dewhirst, Solicitor General
*Montana Department of Justice*

Douglas J. Peterson, Attorney General
James A. Campbell, Solicitor General
*Office of the Nebraska Attorney General*

Leslie Rutledge, Attorney General
Nicholas J. Bronni, Solicitor General
Dylan L. Jacobs, Deputy Solicitor General
*Office of the Arkansas Attorney General*

Lawrence G. Wasden, Attorney General
Brian Kane, Chief Deputy Attorney General
*Office of the Idaho Attorney General*

Dave Yost, Attorney General
Benjamin M. Flowers, Solicitor General
*Office of the Ohio Attorney General*

Herbert H. Slatery, III, Attorney General and Reporter
Andrée S. Blumstein, Solicitor General
Clark L. Hildabrand
Brandon J. Smith
Assistant Solicitors General
*Office of the Tennessee Attorney General and Reporter*

Sean D. Reyes, Attorney General for the State of Utah
Melissa Holyoak, Solicitor General for the State of Utah

Bridget Hill, Attorney General
Ryan Schelhaas, Chief Deputy Attorney General

*Office of the Wyoming Attorney General*

Ashley Moody, Attorney General
James H. Percival, Deputy Attorney General of Legal Policy
*Office of the Florida Attorney General*

Lynn Fitch, Attorney General
Justin L. Matheny, Deputy Solicitor General
*Office of the Mississippi Attorney General*

Patrick Morrisey, Attorney General
Lindsay See, Solicitor General
*Office of the West Virginia Attorney General*

Jason S. Miyares, Attorney General
Andrew N. Ferguson, Solicitor General
Lucas W.E. Croslow, Deputy Solicitor General
*Office of the Virginia Attorney General*

John M. O'Connor, Attorney General
Bryan Cleveland, Deputy Solicitor General
*Oklahoma Attorney General's Office*

Treg R. Taylor, Attorney General
Cori M. Mills, Deputy Attorney General
Christopher A. Robison, Assistant Attorney General
*Alaska Department of Law*

Steve Marshall, Attorney General
Edmund G. LaCour Jr., Solicitor General
Thomas A. Wilson
*Office of the Attorney General, State of Alabama*

Christopher M. Carr, Attorney General
Stephen J. Petrany, Solicitor General
*Office of the Georgia Attorney General*

Alan Wilson, Attorney General for State of South Carolina
Thomas T. Hydrick, Assistant Deputy Solicitor General for State of South
Carolina

For defendants-appellees:

Brian M. Boynton, Principal Deputy Assistant Attorney General
Sarah E. Harrington, Deputy Assistant Attorney General
Sharon Swingle
Joshua Dos Santos
Jean Lin
Jonathan D Kossak
John Robinson
Joseph J. DeMott
*United States Department of Justice*

For proposed intervenor-appellant:

Ahilan T. Arulanantham
Monika Y. Langarica
Talia Inlender
*Center for Immigration Law and Policy, UCLA School of Law*

Joseph Meyers
Victoria Neilson
Matthew Vogel
Sirine Shebaya
*National Immigration Project of the National Lawyers Guild*

                              *s/ Joshua Dos Santos*
                              JOSHUA DOS SANTOS
                              Counsel for Defendants-
                              Appellees

## STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns a preliminary injunction that requires the federal government to continue implementing emergency public-health measures under a Title 42 order previously issued by the Centers for Disease Control and Prevention (CDC), despite CDC's assessment that those measures are no longer required to protect the public health at this stage of the COVID-19 pandemic.  The district court granted this preliminary injunction based on its conclusion that CDC likely could not terminate its Title 42 orders without notice-and-comment rulemaking, and its view that the plaintiff States' alleged potential fiscal harms outweigh the injunction's significant intrusion into CDC's discretion, exercise of the Department of Homeland Security's otherwise statutorily-required immigration processing, and the Executive Branch's foreign affairs function.  Oral argument would be helpful to the Court given the importance of the case and the issues presented.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION ......................................................3

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE................................................................4

     A.    CDC's Title 42 Orders ..................................................4

     B.    CDC's Termination Order ...........................................9

     C.    Prior Proceedings.......................................................13

SUMMARY OF ARGUMENT............................................................ 16

STANDARD OF REVIEW ................................................................. 19

ARGUMENT ...................................................................................... 19

I.     The States' Claims Fail at the Threshold for Lack of Standing, a Cause of Action, and Reviewability............................................................ 19

II.    The States Are Unlikely to Succeed on the Merits of Their Claims. .................. 30

     A.    The Good Cause Exception to Notice and Comment Applies. ..............30

     B.    The Foreign Affairs Exception to Notice and Comment Applies...........39

     C.    The States' Argument Regarding Reliance Interests Does Not Support the District Court's Injunction. ......................................................44

III.   The Equities and Public Interest Weigh Heavily Against the Injunction.......... 49

CONCLUSION .................................................................................. 53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982) ..................................................................... 24, 26

*Allen v. Wright,*
  468 U.S. 737 (1984) ..................................................................... 20, 21

*Arizona v. Biden,*
  No. 22-3272, 2022 WL 2437870 (6th Cir. July 5, 2022) ........................... 24

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................................... 25

*Biden v. Missouri,*
  142 S. Ct. 647 (2022) ........................................................................ 36

*Biden v. Texas,*
  142 S. Ct. 2528 (2022) ................................................................. 28, 51

*Bragdon v. Abbott,*
  524 U.S. 624 (1998) ........................................................................... 52

*California v. Texas,*
  141 S. Ct. 2104 (2021) ....................................................................... 21

*Capital Area Immigrants' Rights Coalition v. Trump,*
  471 F. Supp. 3d 25 (D.D.C. 2020) .................................................... 43

*Central & S.W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) ............................................................. 51

*City of Bos. Delegation v. FERC,*
  897 F.3d 241 (D.C. Cir. 2018) .......................................................... 48

*City of New York v. Permanent Mission of India to the United Nations,*
  618 F.3d 172 (2d Cir. 2010) ................................................... 42, 43, 44

*City of Portland v. EPA,*
  507 F.3d 706 (D.C. Cir. 2007) .......................................................... 37

*Clarke v. Securities Indus. Ass'n,*
  479 U.S. 388 (1987) ..................................................................... 25, 26

*Department of Commerce v. New York,*
139 S. Ct. 2551 (2019) ............................................................ 22

*Department of Homeland Sec. v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) .............................................. 42, 45-46, 48

*East Bay Sanctuary Covenant v. Trump,*
932 F.3d 742 (9th Cir. 2018) ................................................ 42

*El Paso Cty. v. Trump,*
982 F.3d 332 (5th Cir. 2020) ............................................ 21-22

*Ellison v. Connor,*
153 F.3d 247 (5th Cir. 1998) ................................................ 30

*FDA v. American Coll. of Obstetricians & Gynecologists,*
141 S. Ct. 578 (2021) ...................................................... 29, 50

*Federal Deposit Ins. Corp. v. Bank of Coushatta,*
930 F.2d 1122 (5th Cir. 1991) .............................................. 30

*Garland v. Aleman Gonzalez,*
142 S. Ct. 2057 (2022) ...................................................... 50

*Huisha-Huisha v. Mayorkas,*
27 F.4th 718 (D.C. Cir. 2022) ............................................... 8

*Interstate Commerce Comm'n v. Oregon Pac. Indus., Inc.,*
420 U.S. 184 (1975) .......................................................... 35

*Jiao v. Xu,*
28 F.4th 591 (5th Cir. 2022) ............................................... 19

*Jifry v. FAA,*
370 F.3d 1174 (D.C. Cir. 2004) ............................................ 33

*Jordan v. Fisher,*
823 F.3d 805 (5th Cir. 2016) ............................................... 19

*Kiobel v. Royal Dutch Petroleum Co.,*
569 U.S. 108 (2013) .......................................................... 51

*Lane v. Halliburton,*
529 F.3d 548 (5th Cir. 2008) ............................................... 44

*Levesque v. Block,*
　　723 F.2d 175 (1st Cir. 1983) ...................................................... 30, 32

*Lincoln v. Vigil,*
　　508 U.S. 182 (1993) .................................................................... 27, 28

*Lujan v. Defenders of Wildlife,*
　　504 U.S. 555 (1992) ............................................................................ 24

*Make the Road. N.Y. v. Wolf,*
　　962 F.3d 612 (D.C. Cir. 2020) ........................................................... 38

*Marshall v. United States,*
　　414 U.S. 417 (1974) .................................................................... 29, 50

*Maryland v. King,*
　　567 U.S. 1301 (2012) ......................................................................... 49

*Massachusetts v. EPA,*
　　549 U.S. 497 (2007) ........................................................................... 23

*Massachusetts v. Melon,*
　　262 U.S. 447 (1923) ........................................................................... 24

*Natural Res. Def. Council, Inc. v. Evans,*
　　316 F.3d 904 (9th Cir. 2003) ............................................................. 31

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
　　434 U.S. 1345 (1977).......................................................................... 49

*Nken v. Holder,*
　　556 U.S. 418 (2009) ........................................................................... 52

*Perez v. Mortgage Bankers Ass'n,*
　　575 U.S. 92 (2015) ................................................................... 16, 34-35

*Petry v. Block,*
　　737 F.2d 1193 (D.C. Cir. 1984) ........................................................ 32

*Riverbend Farms, Inc. v. Madigan,*
　　958 F.2d 1479 (9th Cir. 1992) ........................................................... 30

*Sierra Club v. U.S. Army Corp of Eng'rs,*
　　295 F.3d 1209 (11th Cir. 2002) ......................................................... 49

*Sierra Club v. U.S. Dep't of Interior*,
   990 F.3d 909 (5th Cir. 2021) ................................................................. 47-48

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ................................................................................ 23

*Texas v. Biden*,
   20 F4th. 928 (5th Cir. 2021), *rev'd on other grounds by*
   142 S. Ct. 2528 (2022) ..................................................... 22-23, 46, 48, 49

*Texas v. Biden*,
   No. 4:21-cv-0579-P, 2022 WL 658579 (N.D. Tex. Mar. 4, 2022) ................. 8

*Texas v. EPA*,
   983 F.3d 826 (5th Cir. 2020) ................................................................... 29

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ...................................................... 22, 23, 39

*Texas v. United States*,
   No. 22-40367, 2022 WL 2466786 (5th Cir. July 6, 2022) .......................... 25

*United States v. Cain*,
   583 F.3d 408 (6th Cir. 2009) ................................................................... 33

*United States v. Johnson*,
   632 F.3d 912 (5th Cir. 2011) ............................................................ 30, 37

*United States v. Texas*,
   No. (22A17), 2022 WL 2841804 (U.S. July 21, 2022) ............................. 25

*Virginia Soc'y for Human Life, Inc. v. FEC*,
   263 F.3d 379 (4th Cir. 2001) ................................................................... 51

*Wages & White Lion Invs., L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) .................................................................. 52

*Webster v. Doe*,
   486 U.S. 592 (1988) ................................................................................ 29

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................... 44-45

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980) ................................................................. 42

*Zhu v. Gonzales,*
  411 F.3d 292 (D.C. Cir. 2005) ................................................................ 28-29

**Statutes:**

Administrative Procedure Act:
  5 U.S.C. § 553(a)(1) ....................................................... 12, 17, 39, 42, 43
  5 U.S.C. § 553(b)(3)(B) ....................................................... 11, 16, 30, 38
  5 U.S.C. §§ 701-706 ........................................................................... 3
  5 U.S.C. § 701(a)(2) ......................................................................... 27

8 U.S.C. § 1252(a)(2)(A)(ii) ............................................................... 50

8 U.S.C. § 1252(f)(1) .......................................................................... 50

19 U.S.C. § 1401(i) ............................................................................. 6

28 U.S.C. § 1292(a)(1) ........................................................................ 4

28 U.S.C. § 1331 ................................................................................ 3

28 U.S.C. § 1346 ................................................................................ 3

28 U.S.C. § 1361 ................................................................................ 3

42 U.S.C. § 265 .................................... 4, 5, 8, 26, 27, 28, 29, 30, 31, 33, 38, 47

42 U.S.C. §§ 266-271 ......................................................................... 27

42 U.S.C. § 268 ................................................................................ 27

42 U.S.C. § 268(b) .............................................................................. 6

**Regulations:**

42 C.F.R. § 71.40 ......................................................................... 31, 38

42 C.F.R. § 71.40(a) ..................................................................... 6, 7, 28

42 C.F.R. § 71.40(c)(2) ...................................................................... 6, 7

42 C.F.R. § 71.40(c)(5) ...................................................................... 6, 7

Exec. Order No. 5143 (June 21, 1929) .................................................... 5

**Legislative Material:**

H.R. Rep. No. 79–1980 (1946) ........................................................ 43

**Other Authorities:**

85 Fed. Reg. 16,547 (Mar. 24, 2020) ............................................ 39

85 Fed. Reg. 16,559 (Mar. 24, 2020) .............................................. 5

85 Fed. Reg. 17,060 (Mar. 26, 2020) .............................................. 6

85 Fed. Reg. 22,424 (Apr. 22, 2020) .............................................. 7

85 Fed. Reg. 31,503 (May 26, 2020) .............................................. 7

85 Fed. Reg. 56,424 (Sept. 11, 2020) ................................. 5, 6, 7, 33

85 Fed. Reg. 65,806 (Oct. 16, 2020) .............................................. 7

86 Fed. Reg. 8267 (Feb. 5, 2021) .................................................. 7

86 Fed. Reg. 9942 (Feb. 17, 2021) ................................................ 8

86 Fed. Reg. 42,828 (Aug. 5, 2021) ....................................... 6, 7, 40

86 Fed. Reg. 58,216 (Oct. 21, 2021) ............................................ 39

87 Fed. Reg. 3425 (Jan. 24, 2022) ............................................... 39

87 Fed. Reg. 15,243 (Mar. 17, 2022) ............................................ 8

87 Fed. Reg. 19,941 (Apr. 6, 2022) ..................................... 9, 10, 11, 11-12, 12, 13, 29, 31,
                                                                    32, 33, 36, 37, 39, 40, 45, 46, 47

Order,
    *P.J.E.S. v. Mayorkas*, No. 20-5357 (D.C. Cir. Jan. 29, 2021) .......................... 8

## INTRODUCTION

This appeal concerns a preliminary injunction that requires the federal government to continue implementing CDC's previously issued Title 42 public-health order. That order is an emergency public-health measure that CDC adopted in response to a serious public-health danger arising from the spread of COVID-19 in certain congregate settings at or near the land border, where noncitizens are held pending their immigration processing. To address that danger during the pandemic, a series of Title 42 public-health orders suspended the right to introduce certain noncitizens seeking to enter the United States from Mexico and Canada. Under those orders, covered noncitizens who enter the country in contravention of the suspension on entry are expelled summarily without being processed under ordinary immigration authorities that would otherwise apply pursuant to Title 8 of the U.S. Code, including Title 8-required procedures for asylum.

CDC first adopted this extraordinary measure in March 2020, at a time when there was a lack of available and effective mitigation measures to address the risks arising from COVID-19 in congregate settings. CDC thereafter reviewed the public-health need for such measures every 30 or 60 days, consistent with its regulations requiring that any order stay in place only as long as required to protect the public health. In April 2022, after CDC's most recent 60-day assessment, CDC determined that a Title 42 order was no longer necessary to avert a serious danger to the public health based on the current state of the pandemic and the availability of less drastic

mitigation measures.  Accordingly, CDC issued a termination of the then-operative order, effective May 23, 2022.

A group of States brought this challenge to CDC's termination order.  The States do not substantively challenge CDC's public-health assessment that the order is no longer justified to protect against dangers arising from COVID-19.  Instead, the States alleged that that CDC was required to take public comment and that CDC failed to adequately consider the costs to the States of returning to ordinary immigration processing.

The district court concluded that the States were likely to succeed on their notice-and-comment claim and entered a preliminary injunction ordering the federal government to continue implementing this extraordinary emergency order.

The district court's preliminary injunction is flawed in multiple respects.  As a threshold matter, the States' claims regarding the financial costs of ordinary immigration processing are not a basis to challenge CDC's termination order under either Article III or the relevant statutes.  The district court was also mistaken that CDC needed to undertake notice-and-comment rulemaking to end this emergency order once the public-health justification lapsed.  Title 42 orders, which had been adopted without notice and comment, were properly terminated without notice and comment.  The termination order comes within two exceptions to the Administrative Procedure Act's notice-and-comment requirement.  The good-cause exception applies because notice and comment would be impractical and contrary to the public interest,

and the foreign-affairs exception applies because Title 42 orders directly involve a foreign affairs function since they entail extensive diplomatic coordination and necessarily operate only through negotiation with foreign governments. This Court should therefore reject the plaintiffs' one-way ratchet theory of notice and comment—that the orders could be put in place immediately without notice-and-comment rulemaking but then must remain in place indefinitely until CDC undertakes notice and comment to rescind them.

Moreover, the equities and the public interest weigh heavily against the injunction's disruption of ordinary immigration processing and intrusion into the Executive Branch's discretion regarding an emergency public-health measure and foreign affairs. Aside from assertions of pretext and that ordinary immigration processing will not offer enough screening for disease generally, the States do not substantively challenge CDC's public-health determination. And the States' alleged harms result from the ordinary operation of congressionally enacted immigration laws, which *must* go back into effect once there is no longer a public-health justification for these emergency orders. The district court fundamentally erred by ordering CDC to maintain such extraordinary emergency measures despite CDC's expert determination that the orders lack a public-health justification.

## STATEMENT OF JURISDICTION

The States invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1346, 1361 and 5 U.S.C. §§ 701-706. ROA.3176. As discussed below (*infra* pp.19-25),

3

the States lack standing.  The district court entered a preliminary injunction on May 20, 2022, and the government filed a notice of appeal the same day.  ROA.3852-54. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the States lack Article III standing and do not come within the zone of interests of 42 U.S.C. § 265;

2.  Whether the termination order is not subject to review under the Administrative Procedure Act (APA) because the decision whether to terminate the Title 42 order is committed to CDC's discretion by law;

3.  Whether CDC's termination order comes within the good-cause and foreign-affairs exceptions to the APA's notice-and-comment requirement;

4.  Whether the equities and public interest weigh against a preliminary injunction.

## STATEMENT OF THE CASE

### A.    CDC's Title 42 Orders

In the Public Health Service Act, Congress provided the Department of Health and Human Services, through CDC, "the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as [CDC] shall designate," whenever CDC "determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States" and that "a suspension of the right to

introduce such persons and property is required in the interest of the public health."

42 U.S.C. § 265. The statute specifies that an order suspending introduction will last

"for such period of time as [CDC] may deem necessary for such purpose." *Id.*[1]

Because this public-health authority may be utilized only when the Executive

Branch determines that the public health requires it, the government has used this

power sparingly as to the entry of persons pursuant to immigration laws. Before the

COVID-19 pandemic, the government had used this authority to restrict the entry of

persons only once, during a meningitis outbreak in certain parts of Asia in 1929. *See*

Exec. Order No. 5143 (June 21, 1929).

In March 2020, CDC invoked this authority in response to the COVID-19

pandemic. The agency published an interim final rule with regulations to govern its

issuance of subregulatory orders under this authority. *See* 85 Fed. Reg. 16,559 (Mar.

24, 2020). Although the interim final rule took immediate effect, CDC sought public

comments on the procedures it was adopting for issuing Title 42 orders. *See id.* at

16,564-65. Concurrently, pursuant to the interim final rule's provisions, CDC issued

its first Title 42 order suspending the right of introduction at U.S. land borders for

certain noncitizens (generally noncitizens without valid travel documents) who would

otherwise be held in congregate settings in Department of Homeland Security (DHS)

---

[1] The statute originally granted this authority to the Surgeon General, but the authority passed by law to the Secretary of the Department of Health and Human Services, who delegated the authority to the CDC Director. *See* 85 Fed. Reg. 56,424, 56,424 (Sept. 11, 2020).

facilities at or near the border.  85 Fed. Reg. 17,060 (Mar. 26, 2020).  CDC determined

that this emergency order was required in the interest of public health because of the

risk of COVID-19 spread in ports of entry and Border Patrol stations, the risk of

further introduction of COVID-19 to government personnel and into the interior of

the country, and the lack of effective mitigation measures at that time.  *Id.* at 17,061.

Because CDC does not have the resources to implement such an order across

the country's borders, CDC requested that DHS change its operations to enforce the

order.  *See* 42 U.S.C. § 268(b); 19 U.S.C. § 1401(i).  DHS enforces such orders by

summarily expelling covered noncitizens, without processing them under the ordinary

immigration authorities pursuant to Title 8 of the U.S. Code.  And because the

government cannot expel persons to another country without that other country's

permission, this order required coordination with foreign governments and could be

enforced only by obtaining other countries' acceptance of expelled noncitizens.  *See* 86

Fed. Reg. 42,828, 42,836 (Aug. 5, 2021).

In September 2020, after considering public comments on the interim final

rule, CDC published a final rule to govern its issuance of Title 42 orders.  *See* 85 Fed.

Reg. at 56,424.  The rule largely mirrors the statutory text.  *See* 42 C.F.R. § 71.40(a).  It

further provides that any Title 42 order must specify, among other things, the serious

danger being prevented and the period of time and circumstances under which the

order will apply.  *Id.* § 71.40(c)(2), (c)(5).  The rule also states that CDC must consult

with other federal departments as "practicable," and that CDC may consult with local and State authorities as the Director "deems appropriate in his or her discretion." *Id.*

The rule states that Title 42 orders should last "only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease." 42 C.F.R. § 71.40 (a). CDC also determined that "recurrent review" of Title 42 orders is a "good policy" for assessing an order's continuing public-health need. 85 Fed. Reg. at 56,454. The rule does not contemplate that CDC would undergo notice and comment to issue or terminate an order, or in connection with its recurrent reviews.

Throughout the pandemic, CDC reviewed the need for its Title 42 public-health orders every 30 or 60 days. The first order lasted 30 days, was twice extended for 30 days, and then was reviewed every 30 days. *See* 85 Fed. Reg. 22,424 (Apr. 22, 2020); 85 Fed. Reg. 31,503 (May 26, 2020). In October 2020, CDC issued a new order requiring review every 30 days. *See* 85 Fed. Reg. 65,806, 65,812 (Oct. 16, 2020).

In February 2021, President Biden directed CDC to consider whether its Title 42 public-health order should be terminated or modified. *See* 86 Fed. Reg. 8267 (Feb. 5, 2021). CDC subsequently determined that its Title 42 order was still required and continued to reassess the order every 30 days. In August 2021, CDC issued a new order and required review every 60 days. *See* 86 Fed. Reg. at 42,830. CDC anticipated that the government would be taking steps "towards the resumption of normal border operations." *Id.* at 42,840. CDC subsequently reviewed the order in October 2021,

December 2021, and February 2022, each time concluding that there remained a

public-health need for a Title 42 order.  CDC did not undertake notice and comment

for any of the Title 42 orders or reviews it conducted throughout the pandemic.

Significant litigation against the orders proceeded during this time, including

two class-action challenges alleging that 42 U.S.C. § 265 did not authorize expulsions.

In one case, the D.C. Circuit partially affirmed a preliminary injunction involving a

class of family units.  *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022).

The court held that Section 265 likely authorizes expulsions, but it concluded that

such expulsions may not be "to places where [the noncitizens] will be persecuted or

tortured" and noted that CDC's Title 42 orders "look[] in certain respects like a relic

from [another] era" because "the difference between [March 2020] and [March 2022]

is considerable."  *Id.* at 722, 734-35.[2]

---

[2] In the second class-action suit, the D.C. Circuit stayed a preliminary injunction involving unaccompanied children.  *See* Order, *P.J.E.S. v. Mayorkas*, No. 20-5357 (D.C. Cir. Jan. 29, 2021).  That appeal is currently in abeyance after CDC excepted unaccompanied children from the Title 42 order because, among other reasons, those children are generally transferred to separate facilities with adequate COVID-19 mitigation protocols.  *See* 86 Fed. Reg. 9942 (Feb. 17, 2021).

Separately, Texas challenged the exception of unaccompanied children and obtained a preliminary injunction on the ground that the exception was likely insufficiently explained.  *See Texas v. Biden*, No. 4:21-cv-0579-P, 2022 WL 658579, at *21 (N.D. Tex. Mar. 4, 2022).  CDC subsequently issued a new order in March 2022 terminating the Title 42 order as to unaccompanied children.  87 Fed. Reg. 15,243 (Mar. 17, 2022).  That March 2022 order has not been challenged.

## B.    CDC's Termination Order

On April 1, 2022, after another 60-day re-evaluation, CDC determined that the extraordinary public-health measures adopted in Title 42 orders were no longer required in the interest of public health.  *See* 87 Fed. Reg. 19,941 (Apr. 6, 2022).

CDC explained the many reasons for its public-health assessment that the order should be terminated.  Case counts had peaked in January 2022, but had fallen by 95%.  87 Fed. Reg. at 19,944 & n.24.  As the Omicron variant became more prevalent, death and hospitalization rates had likewise undergone a "swift descent." *Id.* at 19,948.  The United States was experiencing increasing widespread population immunity, due to both vaccinations and prior infections.  *Id.*  Based on CDC's COVID-19 Community Level analysis, which considers various factors including burdens on healthcare resources, CDC determined that nearly 95% of the U.S. population lived in areas classified as having a "low" COVID-19 Community Level, including "all 24 U.S. counties along the U.S.-Mexico border."  *Id.* at 19,953.  Local healthcare resources were therefore unlikely to be overburdened.  *Id.* at 19,949.

At the same time, mitigation measures, therapeutics and effective treatment options had become widely available.  Vaccination had substantially increased in the United States and around the world, including in countries of origin for the majority of noncitizens crossing the border.  87 Fed. Reg. at 19,949, 19,952 & n.144.  Testing was widely available.  *Id.* at 19,949.  There were now several effective and widely available treatments and therapeutics.  *Id.* at 19,950 & n.125.  Comparable congregate

9

facilities like prisons had also begun loosening pandemic restrictions, "signaling the resumption of more normal operations for congregate settings." *Id.* at 19,951. And more generally, public-health officials' understanding about the epidemiology of COVID-19 was much more advanced, allowing the government to narrowly tailor its mitigation measures. *Id.* at 19,947.

In addition, CDC noted that DHS had implemented masking for migrants, personal protective equipment for personnel, and improved ventilation and distancing. *Id.* at 19,951-52. DHS had also worked with state, local, and non-governmental partners to develop robust testing and quarantine programs along the Southwest Border, and was expanding a vaccination program for noncitizens taken into U.S. Customs and Border Protection custody. *Id.*

CDC recognized that "public health concerns may arise in congregate settings," and that DHS anticipated "an increase in the number of noncitizens being processed in DHS facilities[,] which could result in overcrowding." 87 Fed. Reg. at 19,951-52, 19,956. But the agency determined that this "risk does not present a sufficiently serious danger to public health to necessitate maintaining" the Title 42 order under the changed circumstances. *Id.* at 19,952. "[T]he readily available and less burdensome public health mitigation tools to combat [COVID-19] render[ed]" a Title 42 order "unnecessary." *Id.* at 19,953. And CDC noted that DHS was "taking steps to plan for such increases, including by readying decompression plans, deploying

10

additional personnel and resources to support U.S. Border Patrol, and enhancing its ability to safely hold noncitizens it encounters." *Id.* at 19,956.

Because of the extraordinary nature of its Title 42 order and the lack of a public-health justification, CDC determined that the order's termination should be implemented as soon as practicable. To that end, CDC consulted with DHS to determine the timing of DHS's transition back to ordinary immigration processing at the border, which would entail processing a larger number of noncitizens in its facilities and adopting additional COVID-19 mitigation measures. *Id.* at 19,956. "Based on DHS' recommendation," CDC determined that the termination should be implemented a number of weeks later, on May 23, 2022. *Id.* at 19,955. CDC noted that DHS was readying its "operational capacity" and "implement[ing] appropriate COVID–19 protocols," including by "scal[ing] up" its "vaccination program" "over the next two months." *Id.* at 19,956.

As with all prior Title 42 orders and consistent with its regulations, CDC did not undertake notice and comment. 87 Fed. Reg. at 19,956. "Given the extraordinary nature of an order under Section 265, the resultant restrictions on application for asylum and other immigration processes under Title 8, and the statutory and regulatory requirement that a CDC order under the authority last no longer than necessary to protect public health," CDC determined that it "would be impracticable and contrary to the public interest and immigration laws … to delay the effective date of this termination beyond May 23, 2022" under 5 U.S.C. § 553(b)(3)(B). 87 Fed. Reg.

at 19,956.  CDC noted "DHS's need for time to implement an orderly and safe

termination," which already lengthened the time before the termination would be

effective.  *Id.*  Given the Title 42 order's "significant disruption of ordinary

immigration processing," CDC found "good cause not to delay" by seeking notice

and comment before DHS could get started on that transition.  *Id.*

CDC also explained that "notice and comment are not required" under the

APA's exception for actions that "involve" a "foreign affairs function of the United

States."  87 Fed. Reg. at 19,956 (citing 5 U.S.C. § 553(a)(1)).  That was because Title

42 orders and this termination "concern[ed] ongoing discussions with Canada,

Mexico, and other countries regarding immigration and how best to control COVID–

19 transmission over shared borders."  *Id.*

CDC considered whether any reliance interests existed, but it concluded that

no state or local government had any legitimate reliance interests given that CDC's

orders were expressly temporary emergency measures that were re-evaluated every 30

or 60 days.  87 Fed. Reg. at 19,953-54.  CDC had emphasized in prior orders that it

would flexibly extend, modify, or terminate the order depending on the public-health

need.  *Id.*  CDC noted that "state and local governments could not have reasonably

relied on CDC's indefinite use of its expulsion authority under Section 265," and the

agency had already considered potential strain on healthcare resources and determined

that such a strain was unlikely.  *Id.* at 19,954.  Moreover, CDC concluded that any

reliance interests that existed would not outweigh the need to terminate these

extraordinary orders as soon as practicable once the public-health need had ended.

CDC also explained that it did not have authority to adopt or maintain a Title

42 order due to concerns or costs arising from migration rather than a public-health

need. 87 Fed. Reg. at 19,954. And the time that DHS would take to transition its

border-wide operations back to ordinary immigration processing would also supply

time for correction of any misplaced short-term reliance interests. *Id.* at 19,956.

### C.     Prior Proceedings

A group of States challenged the termination order under the APA. The States

alleged that a return to ordinary immigration processing under Title 8 of the U.S.

Code would increase their costs in areas such as law enforcement, healthcare, and

education because a large number of noncitizens would enter the country and some

portion of those noncitizens would allegedly reside in the plaintiff States. The States

argued that CDC was required to undergo notice and comment to terminate its Title

42 orders and that CDC inadequately considered reliance interests.

The States moved for a preliminary injunction, and also sought and obtained a

temporary restraining order to prevent DHS from beginning the transition to ordinary

immigration processing. ROA.1050, 1820, 1972-75. Shortly thereafter, several

proposed intervenors sought intervention, which the government opposed and the

district court denied. ROA.4014-16.

The district court issued a preliminary injunction barring the federal government from enforcing CDC's termination order.  The court found that the States' theory of standing based on law-enforcement costs was likely too speculative, but it held that the States likely had standing based on their allegations of downstream healthcare costs.  ROA.3823-35.  The court further held that the States' claims come within Section 265's zone of interests, reasoning that Section 265 authorizes immigration regulation for public-health reasons and that termination of such regulation affected the States.  ROA.3836-37.  Relatedly, the court concluded that the decision to terminate the Title 42 order was not committed to agency discretion and hence unreviewable, reasoning that the statute only provides CDC authority to address a "communicable disease" when "required in the interest of public health." ROA.3838 (quotation marks omitted).

On the merits, the district court found the States likely to succeed on their notice-and-comment claim.  ROA.3839-45.  The court first concluded that the good-cause exception to notice-and-comment rulemaking likely does not apply because the court thought that CDC had been considering termination for 14 months and CDC gave DHS time to transition its operations.  The court also believed that the extraordinary nature of Title 42 orders weighed in favor of notice and comment. ROA.3842-3844.  And the court concluded that, although CDC likely could invoke good cause to forgo notice and comment when *issuing* Title 42 orders, the agency

14

could not do so to *terminate* such orders once the public heath need had ceased. ROA.3844.

The district court further concluded that the exception for actions that involve the foreign-affairs function did not apply, reasoning that the termination order's invocation of the exception was insufficiently detailed.  ROA.3845.  The court rejected declarations from DHS and State Department officials explaining the international discussions to which the termination order referred, concluding they were post-hoc justifications.  ROA.3845.

The district court did "not[] … make a finding as to whether the CDC's action was arbitrary and capricious."  ROA.3848.  The court nonetheless suggested that CDC might have failed to consider alternatives to terminating the emergency order. ROA.3847.  The court also acknowledged that CDC had considered the costs and consequences of termination, but it suggested that this consideration might be insufficient because CDC had not solicited comments.  ROA.3847.

Finally, the court concluded that the equities and public interest favored a preliminary injunction.  ROA.3848-50.  The court acknowledged that its order would require the government to keep in place an emergency public-health order that "indisputably impact[s] the operation of the immigration system."  ROA.3849.  But the court determined that the States' alleged financial injuries outweighed that harm because the States were not able to comment on the termination.  ROA.3849.  The court also believed that the harm to the federal government was reduced because Title

42 orders contain certain case-by-case exceptions. ROA.3849. And the court further

determined that the States' alleged harms required nationwide relief. ROA.3851.

## SUMMARY OF ARGUMENT

**I.** The States lack Article III standing and a cause of action, and Congress has

committed CDC's termination of Title 42 orders to the agency's unreviewable

discretion. Neither the Constitution nor applicable statutes permit the States to bring

this policy disagreement into federal court by seeking to force CDC to continue an

emergency COVID-19 order when CDC has concluded that the public-health

justification for that order has ended.

**II. A.** The merits of the States' claims are likewise flawed. Notice-and-

comment rulemaking was not required for CDC's Title 42 orders, which CDC

reviewed every 30 or 60 days pursuant to its regulations authorizing flexible

emergency responses. CDC promulgated its Title 42 orders without notice and

comment, and it was entitled to terminate them without notice and comment as well.

*See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015) (The APA generally requires

"that agencies use the same procedures when they amend or repeal a rule as they used

to issue the rule in the first instance."). Under 5 U.S.C. § 553(b)(3)(B), CDC clearly

had good cause to terminate these extraordinary emergency orders as soon as the

public-health need had lapsed, rather than leaving a Title 42 order in place for many

more months to seek comment on potential immigration-related costs that could not

override CDC's determination that the orders were no longer justified on public-

16

health grounds. Just as it was permissible to promulgate the Title 42 orders without notice and comment, CDC properly terminated them without notice and comment.

**B.** CDC also was not required to go through notice and comment to terminate an order that entails extensive diplomatic engagement and coordination with foreign governments. That context comes within the plain text of Congress's instruction that notice and comment is not required "to the extent that there is involved" "a … foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). CDC's Title 42 orders involve the foreign affairs function because such orders require diplomatic engagement with foreign countries, including international discussions about COVID-19 border policies and migration. In particular, the United States can operationalize such orders only by obtaining other countries' permission to expel persons to those countries under Title 42. CDC's termination order did not need to elaborate on these evident circumstances, particularly since those negotiations are conducted by other agencies. And in addition, declarations from DHS and State Department officials explain that continuing Title 42 orders without a public-health justification would harm U.S. credibility in certain international negotiations.

**C.** This Court need not address the States' arbitrary-and-capricious claims because the district court did not rely on them in granting a preliminary injunction, but in any event they lack merit. CDC acted well within the bounds of reasoned decisionmaking in explaining that any reliance interests would be misplaced because of the expressly temporary and emergency nature of the orders; that any reliance

interests or immigration costs could not outweigh the fact that Title 42 orders are no longer needed to protect the public health; and that the time DHS would take to transition its operations and implement additional COVID-19 mitigation measures would also accommodate misplaced reliance.

Moreover, the district court was mistaken to suggest (without deciding) that the termination might be arbitrary because CDC did not seek comments on reliance interests or the costs of ordinary immigration processing. Notice and comment were not required, and CDC explained why such costs would not warrant continuing the order. The district court's suggestion that CDC needed to consider alternatives is likewise mistaken, particularly when the question at issue was whether to terminate an emergency order that by its nature must come to an end.

**III.** The district court's injunction is also fundamentally improper in view of the equities and public interest. The court ordered the Executive Branch to keep in place an extraordinary emergency order that largely displaces congressionally enacted immigration laws at the border, even though CDC concluded that the emergency order is no longer justified by a public-health need and the States do not substantively challenge that determination. The injunction also seriously intrudes on the Executive Branch's foreign affairs prerogatives by requiring the government to continue negotiating with foreign governments to keep Title 42 orders functioning.

The district court's basis for such a significant intrusion was its conclusion that an injunction was necessary to avoid costs that the States allege will result from

ordinary operation of the immigration laws: primarily, the States' allegations of future

costs resulting indirectly from the federal government's enforcement of immigration

statutes.  Even if those alleged harms qualify as non-speculative irreparable harm, they

cannot possibly justify this injunction.  Many factors in this case—several of

constitutional magnitude—render the district court's injunction an abuse of

discretion.

## STANDARD OF REVIEW

This Court reviews factual findings for clear error, legal conclusions de novo,

and "the grant of a preliminary injunction for abuse of discretion."  *Jiao v. Xu*, 28

F.4th 591, 598 (5th Cir. 2022).  To obtain a preliminary injunction, a plaintiff must

show irreparable injury, a substantial likelihood of success on the merits, that the

balance of harms weighs in favor of a preliminary injunction, and that a preliminary

injunction would not disserve the public interest.  *Jordan v. Fisher*, 823 F.3d 805, 809

(5th Cir. 2016).

## ARGUMENT

I.    **The States' Claims Fail at the Threshold for Lack of Standing, a
      Cause of Action, and Reviewability.**

The fundamental theory underlying the States' suit is that they are harmed by

the ordinary enforcement of the immigration laws that Congress has adopted.  In

particular, the States believe that application of those duly promulgated laws—

including procedures for asylum—will result in excessive migration across the

19

southern border.  The States allege that some noncitizens entering the country will settle in the plaintiff States and then behave in ways that create financial costs.  For example, the States contend that "a far greater number of aliens with meritless asylum claims" will "enter the United States," leading to a greater number of noncitizens being temporarily paroled, and ultimately leading States to provide "emergency medical care, education, and other social services."  ROA.3211-12.  They similarly allege that, because of government resource constraints and increases in migration, many noncitizens will enter the country undetected if ordinary immigration enforcement resumes.  *See* ROA.3183-3212.

Although the effects of longstanding congressionally enacted immigration laws form the gravamen of the States' alleged harms, the States do not claim to be challenging those immigration laws here.  Instead, the States seek to force CDC to continue an emergency order that temporarily disrupted ordinary immigration processing at the border due to the serious danger to public health caused by the COVID-19 pandemic.  Those claims are not cognizable for several interconnected reasons.

**A.**  The States lack Article III standing to bring such a lawsuit.  The States must allege a redressable and cognizable harm that is "fairly traceable" to the challenged action.  *Allen v. Wright*, 468 U.S. 737, 751 (1984).   But the alleged harms here cannot be fairly traced to CDC's termination of these emergency orders.  The States do not allege, for example, that they are harmed because of specific actions they have taken

in reliance on CDC's Title 42 orders.  Instead, the States hold the policy view that current immigration laws and federal government resources are inadequate to address an anticipated surge in migration, and they point to costs that they allegedly incur as an indirect result of the federal government's ordinary enforcement of longstanding immigration laws.  But that is no basis to challenge the termination order.  Title 42 emergency orders must end when the public-health justification for the orders has lapsed, at which point congressionally enacted rules for ordinary immigration processing must go back into effect.  Whatever policy concerns the States may have about patterns of migration, Congress did not adopt Section 265's public-health authority to address them.

Another case where States challenged federal law based on similarly indirect costs is illustrative.  *See California v. Texas*, 141 S. Ct. 2104 (2021).  There, several States challenged the Affordable Care Act's individual mandate based on allegations that other provisions in the Affordable Care Act created "a direct injury resulting from a variety of increased administrative and related expenses."  *Id.* at 2117.  The Supreme Court concluded that increased administrative costs arising from other provisions were "not 'fairly traceable' to enforcement of the 'allegedly unlawful' provision of which the plaintiffs complain."  *Id.* at 2117, 2119 (quoting *Allen*, 468 U.S. at 751).  The Court emphasized that the "other provisions" giving rise to costs "operate[d] independently" and "[n]o one claim[ed] these other provisions violate the Constitution."  *Id.* at 2119-20.  *Cf. El Paso Cty. v. Trump*, 982 F.3d 332, 342-343 (5th

Cir. 2020) (county had no standing to assert a reputational injury claim because the injury was at most traceable to a Presidential proclamation not challenged in that case). Thus, although standing requires "de facto causation" and may sometimes be based on substantiated "predicable effect[s]," *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (quotation marks omitted), a plaintiff lacks standing based on harms from laws that operate independently.

The situation here is similar. The alleged procedural errors in the termination order do not cause the allegedly harmful effects of ordinary immigration processing. Even if CDC took comments on all the benefits and costs of ordinary immigration processing in light of current migratory patterns, that would not obviate the alleged harms flowing from ordinary immigration processing under laws that operate independently, which must resume when the public-health need for these emergency orders ends. Section 265 is a public-health authority for addressing the public-health dangers of communicable diseases, not an immigration "safety valve," as the States erroneously argued in district court. ROA.1061.

The district court acknowledged that the States' allegations of increased criminal activity and human trafficking were too speculative to support standing here. ROA.3833-34. But the court believed that the States nonetheless traced healthcare costs to the termination order based on cases where this Court found similar fiscal harms traceable to an immigration policy. ROA.3835-36; *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015); *Texas v. Biden*, 20 F4th. 928, 969-70 (5th Cir. 2021), *rev'd*

*on other grounds by* 142 S. Ct. 2528 (2022). Those cases, however, did not involve challenges seeking to leverage harms from the ordinary operation of immigration laws to insist on the continuation of a public-health emergency order that must end in the absence of a public-health need.

Nor was the district court correct to suggest that the States could avoid this traceability problem by invoking a "special solicitude" based on these alleged fiscal costs. ROA.3825-26. The Supreme Court gave special solicitude to Massachusetts based on threats to its territory from rising sea levels. *See Massachusetts v. EPA*, 549 U.S. 497, 526 (2007). This Court has extended that holding in situations where States have a procedural right and a "quasi-sovereign interest," such as when an immigration policy pressures a State to change its law regarding issuance of drivers' licenses. *See Biden*, 20 F.4th at 969-70. But such special solicitude "will seldom exist." *Texas*, 809 F.3d at 162. Although the States here allege potential increased costs in processing drivers' license applications, the States allege no comparable pressure to alter state laws. Even if they did so, the traceability problem is insurmountable, as the States challenge only the termination of an emergency public-health order that is expressly temporary and does not purport to change underlying immigration policy. And although a plaintiff does not need to show that a procedural error would necessarily alter the outcome of a proceeding, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009), that does not mean that plaintiffs can rely on harms that arise from laws that operate independently.

23

Longstanding Article III and federalism principles caution against treating States' "special solicitude" as a back door to courts for resolution of all policy disputes. Contrary to the district court's analysis, States cannot seek to redress the harms of its residents as *parens patriae* in a suit against the federal government. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982); *Massachusetts v. Melon*, 262 U.S. 447, 485-86 (1923). Standing also cannot be based on generalized grievances and is more difficult to establish when harms arise from the actions of third parties. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992).

States cannot avoid these bedrock Article III principles of traceability by citing *Massachusetts v. EPA* and proffering any indirect effect on their budgets. As the Sixth Circuit has explained in a recent case challenging certain guidelines for immigration enforcement, *Massachusetts* does not alter "Article III's foundational standing requirements." *Arizona v. Biden*, No. 22-3272, 2022 WL 2437870, at *5 (6th Cir. July 5, 2022). "A State has no more, and no less, reason to fear harms to its bottom line from federal regulations than a person or a business does. *Massachusetts v. EPA* itself relied on authority that distinguished quasi-sovereign interests from those 'capable of estimate in money.'" *Id.* at *6 (citing *Massachusetts*, 549 U.S. at 518-19). If "any federal regulation of individuals … that imposes peripheral costs on a State creates a cognizable Article III injury," there would be no "limits on state standing." *Id.* In a stay decision, this Court "depart[ed]" from the Sixth Circuit's ultimate decision in *Arizona* in a "nearly identical challenge," based on this Court's precedent and the

24

"factual record" in that case.  *See Texas v. United States*, No. 22-40367, 2022 WL 2466786, at *13 (5th Cir. July 6, 2022).  But the Court should not extend its precedents in a way that makes State standing a foregone conclusion as to every significant federal policy.[3]

**B.**  Many of the same principles demonstrate that the States lack a cause of action.  When plaintiffs bring a suit under the APA, their alleged interest must "arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997).  Although the law need not have been enacted for the special benefit of the plaintiff, a party is nonetheless outside the law's zone of interests when its interest is only "marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987).  The "essential inquiry … is whether Congress intended for [that] particular class of plaintiffs to be relied upon to challenge an agency's disregard of the law." *Id.*

Under these principles, the States fall outside Section 265's zone of interests. The States are not regulated by Title 42 orders. Further, Section 265 is a carefully defined grant of emergency authority allowing for temporary suspension of ordinary

---

[3] The Supreme Court subsequently granted certiorari before judgment in *Texas v. United States* and has directed the parties to address Article III standing.  *See United States v. Texas*, No. (22A17), 2022 WL 2841804, at *1 (U.S. July 21, 2022).  The traceability problem of challenging a public-health order based on the indirect effects of ordinary immigration processing is not present in that case, so that decision does not counsel in favor of abeyance here.

immigration processing to protect against a serious public-health danger. Such

authority necessarily requires flexibility and termination as soon as the public-health

need has ceased. Congress could not have envisioned or intended that all 50 States

would be possible challengers of CDC's discretionary public-health decisions pursuant

to 42 U.S.C. § 265. To the contrary, as explained below, Congress expressly

committed the termination of these public-health orders to CDC's discretion.

The States' alleged interests here are also entirely "inconsistent with the

purposes implicit in the statute." *Clarke*, 479 U.S. at 399. The States seek to force

CDC to continue these emergency orders *in the absence* of a public-health

justification—the exact opposite of what the statute anticipates. The States point to

nothing to suggest that Congress intended to allow lawsuits seeking to continue such

orders regardless of their public-health need, based on claims that congressionally

enacted immigration laws are too costly for States.

The district court thought that the States must be proper plaintiffs because of

their "interest in the health and welfare of their citizens … during a pandemic."

ROA.3836. But this conclusion is directly contrary to the Supreme Court's

instruction that States cannot sue the federal government in a *parens patriae* capacity.

The federal government is also a guardian of citizens' health and welfare. *See Alfred L.*

*Snapp*, 458 U.S. at 610 n.16. There is no indication that Congress intended to depart

from that principle by allowing States to second-guess the Executive Branch's public-

health decisions.

The district court was also incorrect to conclude that States must be proper plaintiffs because Section 265 is not "solely a public health measure." ROA.3836-37. Title 42 orders have "consequences as far as immigration" because they disrupt ordinary immigration processing, and CDC required DHS's aid to enforce the orders under 42 U.S.C. § 268. ROA.3837. But that does not mean that States' interests in avoiding any indirect costs from ordinary immigration processing come within the zone of interests of Section 265, a statute that Congress placed in the Public Health Service Act alongside quarantine authorities, and the terms and title of which make clear that it is an emergency public-health measure. *See* 42 U.S.C. § 265 (titled "Suspension of entries and imports from designated places to prevent spread of communicable diseases"); *id.* §§ 266-271. Section 265 does not authorize CDC to enter Title 42 orders for non-public-health reasons, so it cannot countenance claims seeking to prevent the termination of such an order for non-public-health reasons.

**C.** Congress also committed the termination of any Title 42 order to CDC's discretion, rendering the termination order unreviewable. *See* 5 U.S.C. § 701(a)(2). Although courts presume reviewability under the APA, Congress has precluded review when "the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quotation marks omitted). Review is also precluded for "administrative decisions that courts traditionally have regarded as committed to agency discretion"—particularly judgments that "require[] a complicated balancing of

a number of factors which are peculiarly within [the agency's] expertise" and "area[s] of executive action in which courts have long been hesitant to intrude." *Id.* at 191-93 (quotation marks omitted).

Both circumstances are present here. Section 265 entrusts the decision to enter an order to CDC's "determin[ation]" regarding "the interest of public health." 42 U.S.C. § 265. While the statute gives CDC power to enter these orders as a discretionary matter, it does not *require* such orders. *See Biden v. Texas*, 142 S. Ct. 2528, 2541 (2022) (noting that "may" connotes discretion). No one can bring suit to force CDC to adopt such an order. Likewise, Section 265 does not provide judicially manageable standards to guide a court's review of CDC's discretion with respect to the termination of such an order. The statute leaves the matter to CDC's determination regarding "the interest of public health" and expressly provides that such orders should last "for such period of time as [CDC] *may deem necessary* for such purpose." 42 U.S.C. § 265 (emphasis added). CDC's regulation implementing Section 265 states the same, leaving the matter to the agency's discretion regarding the interest of public health while requiring only that the agency publish certain information about its decision. *See* 42 C.F.R. § 71.40(a). As courts have recognized, the word "deem" demonstrates that the "determination calls upon [an agency's] expertise and judgment unfettered by any statutory standard whatsoever." *Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *see Webster v. Doe*, 486 U.S. 592, 600-01 (1988) (similar); *Texas v. EPA*, 983 F.3d 826, 837 (5th Cir. 2020) (similar).

Congress's decision to commit this question to CDC's discretion is consistent with longstanding deference that courts give the Executive Branch in handling public-health emergencies, which involve weighing of a wide array of factors in the agency's expertise. *See* 87 Fed. Reg. at 19,955 (noting factors that CDC considered in assessing public health). Courts have long been hesitant to intrude on public-health assessments like these without statutory factors to guide their inquiries. *See, e.g., FDA v. American Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578, 579 (2021) (Roberts, C.J., concurring in the grant of application for stay) (noting deference owed "concerning government responses to the pandemic"); *Marshall v. United States*, 414 U.S. 417, 427 (1974) (courts may not substitute their judgment for an agency's "in areas fraught with medical and scientific uncertainties").

The district court concluded otherwise on the ground that Section 265 conditions the issuance of a Title 42 order on certain "determin[ations]" by CDC; namely, that CDC "determine" there is a "serious danger" arising from a "communicable disease" and that an order is "required in the interest of public health." 42 U.S.C. § 265; ROA.3838. But those general contours are *all* the statute provides. It provides no guidelines for a court to second-guess CDC's assessment of the level of danger, nor when a measure is "required in the interest of public health." And most importantly, the statute explicitly states that the order should last as long as CDC "may deem necessary." 42 U.S.C. § 265. *See Ellison v. Connor*, 153 F.3d 247, 254 (5th Cir. 1998) (finding that decision was committed to agency discretion where the

29

law and regulations "'exude[d]' discretion"); *Federal Deposit Ins. Corp. v. Bank of Coushatta*, 930 F.2d 1122, 1129 (5th Cir. 1991) (similar).

## II. The States Are Unlikely to Succeed on the Merits of Their Claims.

The district court also erred in holding that CDC was likely required to undertake notice-and-comment rulemaking to terminate its expressly temporary order. Just as CDC was undisputedly permitted to promulgate the orders without notice and comment, it could terminate them using the same process. As with all prior Title 42 orders, two exceptions apply here under the plain terms of the APA.

### A. The Good Cause Exception to Notice and Comment Applies.

Agencies are not required to undertake notice-and-comment rulemaking "when the agency for good cause finds … that notice and public procedure … are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). Although courts have construed this good-cause exception narrowly, *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011), the exception must still have effect and applies when, for example, notice-and-comment rulemaking "would interfere with the agency's ability to carry out its mission," *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1484 (9th Cir. 1992), or would be inconsistent with the agency's "statutory duties," *Levesque v. Block*, 723 F.2d 175, 184 (1st Cir. 1983). The extraordinary circumstances here fall within the heartland of this exception, which

must be evaluated "case-by-case, sensitive to the totality of the factors at play." *Natural Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 911 (9th Cir. 2003).

CDC's Title 42 orders are expressly framed as temporary public-health emergency orders that CDC evaluates every 30 or 60 days "to ensure their continued necessity." 87 Fed. Reg. at 19,953. CDC issued these subregulatory orders pursuant to duly promulgated regulations (on which the agency sought public comment) that authorize flexible responses to public-health circumstances and periodic reviews. Those orders are also extraordinary in that they suspend ordinary immigration processing pursuant to congressionally enacted immigration laws and must last "only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease." 42 C.F.R. § 71.40; 42 U.S.C. § 265.

Such emergency orders are a manifestly poor fit for notice-and-comment rulemaking. That process would take many months to complete and impose considerable burdens on CDC, particularly given CDC's monthly or bimonthly reviews, and could lead CDC to continue extraordinary public-health orders long after they were warranted. Indeed, when CDC took comment on the regulations allowing for flexible Title 42 orders after issuing an immediately effective interim final rule, the process took more than five months.

As CDC explained in the termination order, these circumstances render notice and comment contrary to the public interest and impracticable. *See* 87 Fed. Reg. at

19,956.  CDC noted "the extraordinary nature of an order under Section 265,"

including the "restrictions on application for asylum and other immigration processes

under Title 8."  *Id.*  CDC further noted "the statutory and regulatory requirement"

that Title 42 orders  "last no longer than necessary to protect public health."  *Id.*  For

those reasons, termination should be implemented as soon as practicable, and further

"delay" "would be impracticable and contrary to the public interest and immigration

laws that apply in the absence of an order under 42 U.S.C. 265."  *Id.*  CDC explained

that "DHS requires time to institute operational plans to implement this order,

including COVID-19 mitigation measures, and begin regular immigration processing

pursuant to Title 8," and therefore already extended the termination of the order by

the amount of time "need[ed] to implement an orderly and safe termination."  *Id.* at

19,955.  But CDC found "good cause not to … delay the termination of this order

past" DHS's practicable implementation date of May 23, 2022.  *Id.* at 19,956.

CDC's finding of good cause is plainly reasonable under the "totality of the

circumstances," *Petry v. Block*, 737 F.2d 1193, 1200 (D.C. Cir. 1984).  Fidelity to

Congress's laws weigh heavily in favor of ending these emergency orders as soon as

CDC determines that their public-health justification has ended.  *See Levesque*, 723

F.2d at 184 (good cause applies "when the agency could not both follow [notice and

comment] and execute its statutory duties").  This is not an ordinary situation where

an agency adopts a permanent policy and then reverses course.  No one can

reasonably dispute that Title 42 orders are temporary emergency public-health

measures that must come to an end when CDC deems them unnecessary, nor that prolonging the orders substantially disrupts the ordinary operation of the immigration laws according to Congress's design—including asylum procedures. *See Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (good cause applies "where delay could result in serious harm"); *cf. United States v. Cain*, 583 F.3d 408, 421 (6th Cir. 2009) ("Congress can implicitly set aside the APA when it specifically requires rapid action.").

CDC's regulations and past practice confirm that notice-and-comment rulemaking would be impractical and contrary to the public interest here. Section 265 provides for issuing suspensions on the right to introduce certain persons "in accordance with regulations." 42 U.S.C. § 265. CDC considered and took public comment on the procedure for adopting Title 42 orders. The resulting regulations provide for issuance of such orders without additional rulemaking processes and "establish[] a flexible procedure for tailoring the exercise of … [Section 265] authority in response to" both "the current COVID-19 pandemic" and "future public health threats." 85 Fed. Reg. at 56,426. Some commenters on the regulations had suggested that "CDC self-impose a required expiration for each order, or, alternatively a short-interval and recurrent review." *Id.* at 56,454. After considering the question, CDC decided to undertake periodic reviews. *Id. All* prior Title 42 orders have thus been issued without notice and comment.

The district court's contrary conclusion reflected a misunderstanding of this context. The court stated that "CDC was ordered to consider the need to continue its

Title 42 orders by Executive Order over fourteen … months prior to issuing the Termination Order," and that "this fourteen-month period provided the CDC with ample time to … undergo the normal notice-and-comment process." ROA.3842. That is incorrect: CDC considered the need for these orders in separate reviews every 30 or 60 days, not in one 14-month-long review. In February 2021, President Biden ordered CDC to assess whether to continue these orders. CDC did so and subsequently reaffirmed the continued need for these orders no fewer than 9 times, including in the August 2021 Title 42 order that the States seek to continue in this lawsuit. Each instance constituted a separate reevaluation in which CDC did not know the outcome of its assessment beforehand. CDC's subsequent termination order in April 2022 was thus based on conditions at that time, including the impacts of the Omicron variant in early 2022. *See* 87 Fed. Reg. at 19,948. But CDC cannot as a practical matter conduct notice and comment every 30 or 60 days. Such a requirement would be a recipe for administrative paralysis.

The district court also fundamentally erred in suggesting that, although CDC might be able to *issue* an emergency order without notice and comment, the agency cannot *terminate* an order in the same way. ROA.3843. That view is inconsistent with the general principle "that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015)). It is also inconsistent with the nature of an *emergency* order, which must be issued quickly and last no longer than necessary. *See*

*Interstate Commerce Comm'n v. Oregon Pac. Indus., Inc.*, 420 U.S. 184, 187 (1975) (Powell, J., concurring) ("[T]he justification for [emergency] action ends with the emergency that called it forth."). And it ignores the context here, where CDC was conducting reviews every 30 or 60 days.

The district court's approach would increase delay and reduce CDC's ability to flexibly address a public-health emergency. Notice-and-comment rulemaking is resource-intensive, whereas emergency orders are made under fast-changing and uncertain conditions. If an agency must undergo notice and comment to terminate an emergency order, resource constraints may deter the agency from adopting an emergency order in the first place, because the task of unwinding the order would be burdensome. The same burdens and resource constraints might require an agency to continue a disruptive order long past its need. And requiring notice and comment for terminations would create legal uncertainty, as the agency would not know whether it needs to undergo notice and comment if it modifies, replaces, or terminates a measure only in part.

The district court was likewise mistaken in stating that the termination order is "internally inconsistent" because CDC gave DHS time to transition its operations back to ordinary immigration processing. ROA.3842. As explained above, it was DHS that had to implement Title 42 orders at the border, not CDC. That entailed changing DHS procedures from ordinary processing under Title 8 to summary expulsions under Title 42 and required diplomatic engagement with other countries.

CDC recognized that transitioning back to ordinary immigration processing would require time. *See* 87 Fed. Reg. at 19,955-56. DHS would need to prepare for larger numbers of noncitizens in its facilities, including by adopting additional COVID-19 mitigation measures. *Id.* More generally, DHS cannot change its border operations overnight. *Id.* CDC thus consulted with DHS and determined that DHS would need several weeks to transition to ordinary operations under Title 8 and prepare additional COVID-19 mitigation measures. *Id.* That delay was administratively necessary and allowed DHS to adopt additional mitigation measures for public-health reasons; it thus has no bearing on the propriety of notice-and-comment procedures, which would entail substantially greater delay without a public-health justification. As the Supreme Court has recognized, administratively necessary delay does not undercut a finding of good cause. *See Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) ("[W]e cannot say that . . . the two months the agency took to prepare [its rule] . . . constitutes 'delay' inconsistent with the Secretary's finding of good cause.").

The district court suggested that CDC needed to show that circumstances "*prevented* the CDC from" undertaking notice and comment. ROA.3844 (emphasis added). CDC did so, particularly because notice-and-comment rulemaking was fundamentally incompatible with the agency's 60-day reviews. In any event, although this Court has found notice and comment required in part because an agency had time to undertake that process, *see Johnson*, 632 F.3d at 929, there is no rule that agencies always must undertake notice-and-comment rulemaking whenever it is theoretically

possible, no matter how great the disruption.  That would be inconsistent with the

good cause exception's text, which applies when notice and comment is "contrary to

public interest," "unnecessary," or "impractical"—not just when there is no time.

Such a view would also suggest that CDC's most recent Title 42 order was likewise

unlawful for failure to undergo notice and comment; that August 2021 Order (which

the States seek to continue through this lawsuit) was issued more than a year after the

pandemic began and 10 months after the earlier order.

Nor was the district court correct to suggest that CDC was required to

"educate itself" through public comment.  ROA.3843 (quotation marks omitted).  As

CDC explained, Title 42 orders are not general policymaking tools for "controlling

immigration."  87 Fed. Reg. at 19,954.  Section 265's plain terms make clear that the

duration of these orders is based on CDC's expert evaluation of the public-health

situation.  Comments about the costs of ordinary immigration processing, which lie

outside CDC's expertise, thus would not be relevant to CDC's decision whether to

terminate an emergency order, and could not provide a legitimate basis to continue

Title 42 orders without a public-health need.  *Cf. City of Portland v. EPA*, 507 F.3d 706,

714 (D.C. Cir. 2007) (rejecting argument that an agency had inadequately responded

to certain comments because the comments were not relevant to the agency's

determination).  Nor did the district court identify anything more that public

comment would have revealed about the termination's timing.  CDC had already

consulted with DHS, which was in the best position to provide the relevant factual

information needed for CDC to engage in its public-health assessment. And CDC also had already considered local healthcare resources.

More fundamentally, as explained, Congress committed the duration of these orders to CDC's discretionary public-health assessment. The statute contemplates the issuance of suspension orders only "in accordance with regulations," 42 U.S.C. § 265, which CDC did, *see* 42 C.F.R. § 71.40. Nothing in this statute, enacted before the APA, suggests that Congress envisioned anything more than compliance with regulations, much less a process as burdensome as notice-and-comment rulemaking. When a decision is committed to the agency's expert discretion in this way, "notice-and-comment procedure would be an empty, yet time-consuming, exercise—all form and no substance." *Make the Road. N.Y. v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020).

The district court similarly erred by stating that the extraordinary nature of Title 42 orders weighed in favor of notice and comment and that CDC's invocation of good cause was overbroad. The court ignored CDC's considered view of the public interest and assumed that any important action must go through notice and comment. But the APA presumes that some important actions will not go through notice and comment where, as here, such procedures will be "contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). Title 42 orders are indeed extraordinary, but for reasons that make notice-and-comment rulemaking a poor fit. As to notice, the terms of these emergency public-health orders and their authorizing regulations already announced that the orders would be re-evaluated periodically and could end at any time. And as

CDC explained, the extraordinary disruption of these orders weighed decisively in favor of terminating them as soon as their public-health justification ended.

**B.    The Foreign Affairs Exception to Notice and Comment Applies.**

Congress also provided that notice and comment does not apply "to the extent that there is involved" "a … foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). Although courts construe the exception narrowly, *see Texas*, 809 F.3d at 171, the termination order falls within its plain terms.

Title 42 orders are part of a broader array of COVID-19 orders related to U.S. borders that required close coordination with Mexico and Canada, all of which were promulgated without notice-and-comment rulemaking. *See, e.g.*, 87 Fed. Reg. 3425, 3427 (Jan. 24, 2022) (vaccination requirement at land ports of entry); 85 Fed. Reg. 16,547, 16,547 (Mar. 24, 2020) (limits on non-essential travel at land ports of entry); 86 Fed. Reg. 58,216 (Oct. 21, 2021) (same); 87 Fed. Reg. at 19,944-47 (noting similar orders).

By their very nature, Title 42 orders require exercise of the Executive Branch's foreign affairs function to be operational. The United States cannot summarily expel noncitizens without permission from the receiving countries. As a prior CDC order explained, that permission requires diplomatic engagement, and countries do not always agree. For example, the Mexican government has placed restrictions on the individuals it will accept for return via the Title 42 expulsion process. 86 Fed. Reg. at

42,836.  And many countries impose requirements for individuals being expelled under Title 42, such as COVID-19 testing, consular interviews, and identity verification.  *Id.*  Terminating Title 42 orders similarly requires close coordination with foreign governments, and, as explained below, continuing extraordinary public-health measures such as summary expulsion where there is no public-health need threatens harm to our foreign relations.

In accordance with that context, as all Title 42 orders before it, CDC's termination order explained that it was not subject to notice and comment because it "concerns ongoing discussions with Canada, Mexico, and other countries regarding immigration and how best to control COVID-19 transmission over shared borders." 87 Fed. Reg. at 19,956.  Because these orders by their nature require international negotiations and form part of a broader discussion regarding public health at the borders and migration, they entail precisely the kind of agency actions that Congress exempted from notice and comment.

Since CDC does not itself exercise the foreign affairs function, State Department and DHS declarants have provided additional details regarding the foreign affairs discussions to which the termination order referred.  DHS's Acting Assistant Secretary for Border and Immigration Policy explained that "DHS has worked closely with the Department of State … to engage with the government of Mexico and other partner countries in the hemisphere to coordinate the enforcement of [CDC's Title 42] Order" because such orders "rel[y] on DHS to enforce it by

40

expelling covered individuals" with the permission of "Mexico or … their home

country." ROA.3117. A Deputy Assistant Secretary in the State Department likewise

explained that "[t]hroughout the COVID-19 pandemic, the U.S. government has

undertaken extensive diplomatic engagement with partner governments on the

implementation and coordination of migration management as impacted by the

CDC's Title 42 [orders]." ROA.3112-13. The declarations also noted that

termination of the order has entailed significant coordination and planning with

foreign governments. ROA.3112, 3117-18. And both declarations explained that

"continuation of the Title 42 Order without a corresponding public health

justification" "would undermine the United States' credibility" and impair other

efforts to obtain those countries' agreement on migration measures. ROA.3118;

ROA.3114 (noting various international negotiations and explaining that

"continuation of the Title 42 Order without a corresponding public health

justification will undermine U.S. credibility with foreign partners").

The district court declined to apply the foreign affairs exception because

CDC's invocation of it in the termination order was only one sentence long and the

court believed that the declarations were post-hoc justifications. But CDC did not

need to provide lengthy explanation given that Title 42 orders can operate only

through use of the foreign affairs function. To invoke this exception, CDC only

needed to establish that Title 42 orders involve use of the government's foreign affairs

function, which the agency did. And the declarations "elaborate[d]" details about

negotiations that CDC's order referenced and that are not within the province of

CDC's expertise; they did not provide "new" reasons bearing "little relationship" to

CDC's explanation. *See Department of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S.

Ct. 1891, 1908 (2020) (explaining the difference between elaboration and post-hoc

justifications); *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980) (citing affidavits

in evaluating the application of the foreign affairs exception).

The district court noted uncertainty about what test governs application of the

foreign affairs exception. But, consistent with the foreign affairs exception's text

exempting actions "to the extent there is involved" a "foreign affairs function," 5

U.S.C. § 553(a)(1), the proper question is whether the order "relates directly to" or

directly involves a foreign affairs function. *City of New York v. Permanent Mission of India

to the United Nations*, 618 F.3d 172, 202 (2d Cir. 2010). In cases involving

"immigration" policies with merely "incidental" effects on foreign affairs, some courts

have expressed concern that attenuated foreign affairs effects would "eliminate[]

public participation" in immigration rules. *Id.* at 202. In those cases, those courts

asked whether "application of '[notice-and-comment] will provoke definitely

undesirable international consequences.'" *East Bay Sanctuary Covenant v. Trump*, 932

F.3d 742, 776 (9th Cir. 2018) (alteration omitted).

As explained above, the government has identified definitely undesirable

international consequences of delay in this case because continuation of Title 42

orders without a public-health justification would harm U.S. credibility in ongoing

42

negotiations.  But in any event, as the Second Circuit has explained, when an agency action directly "involve[s]" a "foreign affairs function," 5 U.S.C. § 553(a)(1), such as the use of diplomatic functions, it is inappropriate to require anything more than the foreign-affairs exception's text.  *New York*, 618 F.3d at 202.  "[T]he phrase 'provoke definitely undesirable international consequences'" is merely "an illustration given in the APA's legislative history;" it is not "the definition for 'foreign affairs function.'"  *Id.* (quoting H.R. Rep. No. 79–1980, at 23 (1946)).  As several courts have noted, there is no textual basis for interpreting the phrase "involve[s] a … foreign affairs function" as requiring a showing of definitely undesirable international consequences.  *See id.*; *Capital Area Immigrants' Rights. Coal. v. Trump* (*"CAIR"*), 471 F. Supp. 3d 25, 53 (D.D.C. 2020) (noting that such an interpretation would be "unmoored from the legislative text").

Indeed, such a requirement would make the foreign affairs exception superfluous because the good-cause exception would apply where taking public comment would lead to negative international consequences.  *CAIR*, 471 F. Supp. 3d at 53 (noting this point).  It would also require courts to evaluate how serious a particular international consequence would be, which is "generally beyond the authority or competency of a court's adjudicative powers."  *Lane v. Halliburton*, 529 F.3d 548, 559 (5th Cir. 2008).

Congress instead made the judgment that notice and comment are not required for this category of agency actions, without requiring the Executive Branch to offer

public views about foreign affairs consequences.  *See New York*, 618 F.3d at 202

("[D]iplomatic functions[] … represent the exception's paradigm case.").  Unlike the

good cause exception, the foreign affairs exception's text does not refer to the

practicality or public interest of notice and comment.  That choice makes sense.

Diplomatic engagement often involves sensitive factors and perceptions that are

difficult to quantify or express publicly—such as how the United States might be

perceived by foreign governments when it pursues those nations' assistance in

implementing a particular policy.  *See* ROA.3114, 3118.

In any event, applying the foreign affairs exception's text in these

circumstances would not mean that the exception would cover all immigration rules

with attenuated effects on foreign affairs.  Title 42 orders are not immigration policies

and inherently require diplomatic engagement to function.

### C.     The States' Argument Regarding Reliance Interests Does Not Support the District Court's Injunction.

The district court did not decide whether the States were likely to succeed on

their claim that CDC insufficiently considered reliance interests.  Because "[a]

preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v.*

*Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and the district court did not

exercise its discretion regarding those claims, this Court should not address those

arguments in the first instance.  But regardless, the district court's suggestion that the

termination order might be arbitrary and capricious in other ways was mistaken.

44

First, the district court stated that CDC might have acted arbitrarily by failing to seek comment regarding reliance interests. ROA.3847. That is in effect another version of the States' notice-and-comment claim, and it fails for the same reasons. An agency does not act arbitrarily when it appropriately invokes exceptions to notice and comment that Congress provided. Nor was it arbitrary for CDC to make the necessary public-health determination without notice and comment, as it had done in every prior order. The agency's steady course in repeatedly assessing the continued need for emergency orders as expeditiously as possible is consistent with the orders' extraordinary nature: as the agency recognized, such orders should not continue after their public-health justification has ceased. Moreover, comments on the costs of ordinary immigration processing are irrelevant to CDC's inquiry because Section 265 is a public-health authority, not a tool for immigration policymaking. And CDC *did* consider whether any reliance interests would affect its analysis. *See* 87 Fed. Reg. at 19,953-54.

Second, the district court mistakenly suggested that CDC may not have sufficiently considered alternatives. ROA.3847. "Agencies are not compelled to explore every alternative device and thought conceivable by the mind of man." *Regents*, 140 S. Ct. at 1915 (quotation marks omitted). That principle applies *a fortiori* here, since Title 42 orders are temporary and *must* terminate once the CDC determines that there is no longer a public-health need. The States have not challenged the substance of CDC's public-health conclusion that the current stage of

45

the pandemic no longer justifies these orders.  And the district court did not describe what possible alternatives to termination might exist if there is no longer a public-health justification for these orders.  The district court's reliance on *Texas v. Biden* was thus inapposite, as that case involved an immigration policy that was not conditioned on the existence of emergency circumstances by statute.  *See Biden*, 20 F.4th at 941.

In addition, the States' argument that CDC insufficiently considered reliance interests lacks merit.  CDC explained that reliance interests in this context were unlikely and illegitimate, and that any reliance interests or immigration costs would not outweigh the need to terminate these emergency orders once their public-health justification ended.  In particular, CDC noted that Title 42 orders have been, "by their very nature, short-term orders" that are expressly "subject to change at any time" and "have consistently been subject to periodic reviews to ensure their continued necessity."  87 Fed. Reg. at 19,953.  No State could have  "reasonably relied" on orders reviewed every 30 or 60 days or on "CDC's indefinite use of its expulsion authority under Section 265."  *Id.* at 19,954.  CDC further explained that its authority to expel noncitizens "remained contested" in several lawsuits throughout most of the pandemic, creating legal uncertainty that further made reliance unreasonable.  *Id.* at 19,953-54.  And the operative August 2021 Title 42 order had also advised the public that the government "would be taking steps towards the resumption of normal border operations."  *Id.* at 19,954.

In addition, CDC evaluated the effects of termination on healthcare resources, including by considering a number of metrics that bear on the healthcare costs borne by state and local governments.  87 Fed. Reg. at 19,948-49, 19,953.  CDC further explained that "to the extent that state and local governments along the border or elsewhere were relying on an order under 42 U.S.C. 265 as a means of controlling immigration, such reliance would not be reasonable or legitimate" because Title 42 orders "are not, and do not purport to be, policy decisions about controlling immigration" and instead "depend[] on the existence of a public health need."  87 Fed. Reg. at 19,954.  Moreover, even if any legitimate reliance interests existed, CDC concluded that such an interest would not be "weighty enough to displace CDC's determination that there is no public health justification for [continuing the Title 42 order] at this time."  *Id.*  And CDC reasoned that to the extent any state or local government had made any short-term plans based on the continued existence of Title 42 orders, DHS's transition period would provide "time to adjust to the resumption of regular Title 8 immigration processing."  *Id.*

This analysis is plainly sufficient "under the …narrow and highly deferential" arbitrary-and-capricious standard for reasoned decisionmaking.  *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913-914 (5th Cir. 2021) (quotation marks omitted).  In *Regents*, the Supreme Court described the kind of analysis that suffices under the APA's deferential standard.  *Regents*, 140 S. Ct. at 1913.  In particular, the Court explained that the agency "could respond that reliance … was unjustified in light of

the express limitations in the [policy]." *Id.* at 1914. "Or [the agency] might conclude that reliance interests in benefits that it views as unlawful are entitled to no or diminished weight." *Id.* "And, even if [the agency] ultimately concludes that the reliance interests rank as serious, they are but one factor to consider," and the agency "may determine, in the particular context before it, that other interests and policy concerns outweigh any reliance interests." *Id.* Accordingly, although an agency may act arbitrarily by failing to consider reliance interests at all, *see Biden*, 20 F.4th at 990, *Regents* makes clear that the inquiry required by the APA is not demanding.

CDC's consideration of reliance interests is more than sufficient under *Regents*. Mere disagreement with CDC's view is not a reason to challenge the order as arbitrary and capricious. Nor have the States demonstrated that CDC acted arbitrarily in granting DHS time to adopt additional mitigation measures for public-health reasons and relying on DHS's consultation regarding the timing for its transition. *See City of Bos. Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018) ("Agencies can be expected to respect" the expert determinations of "other agencies." (quotation marks omitted)); *Sierra Club v. U.S. Army Corp of Eng'rs*, 295 F.3d 1209, 1222 (11th Cir. 2002) (similar).

The flaws in the States' reliance interest argument are even more apparent because the States have not identified any action that they have taken in reliance on Title 42 orders remaining in place, instead relying on the indirect costs of returning to ordinary immigration processing. Such costs did not provide a basis to continue

CDC's Title 42 order without a public-health justification. And even if indirect costs incurred by States might sometimes qualify as reliance interests when the government terminates a policy, *see Biden*, 20 F.4th at 990, the States cannot claim similar reliance in a temporary emergency order that by its nature must end once the public-health justification has ended.

## III.    The Equities and Public Interest Weigh Heavily Against the Injunction.

The district court further abused its discretion in weighing the equities and public interest. Every time the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). Several factors make this injunction even more intrusive than most such injunctions.

The district court not only intervened in the government's handling of the pandemic, but affirmatively ordered the government to continue an extraordinary emergency order. *See FDA*, 141 S. Ct. at 578 (granting stay of injunction ordering government to apply an emergency public-health measure). The court did so despite the government's conclusion that the order lacks a public-health justification, and even though the States have not substantively challenged that public-health

assessment. *See Marshall*, 414 U.S. at 427 (courts may not substitute their judgment

for an agency's "in areas fraught with medical and scientific uncertainties").

In addition, this injunction displaces the congressionally enacted statutory

scheme for ordinary enforcement of the immigration laws—including the Title 8

procedures that Congress created for asylum. As the district court acknowledged,

enjoining the termination of CDC's Title 42 order "indisputably impact[s] the

operation of the immigration system under Title 8." ROA.3849. And Congress

prohibited courts from enjoining the government's exercise of discretion to process

noncitizens under various provisions of the Immigration and Nationality Act. *See* 8

U.S.C. § 1252(f)(1); *id.* § 1252(a)(2)(A)(ii); *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057

(2022). The injunction further interferes with the Executive Branch's foreign affairs

function. It effectively requires the government to continue negotiating with foreign

governments to implement a COVID-19 measure that CDC has concluded is no

longer justified, distracting from the government's other interests in its bilateral

relationships with these countries. The Supreme Court has recently reiterated "the

danger of unwarranted judicial interference in the conduct of foreign policy" and the

"significant burden" of "forc[ing] the Executive to the bargaining table" with another

country over a policy that it "wish[es] to terminate." *Biden*, 142 S. Ct. at 2543 (quoting

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115-16 (2013)).

The weight of this disruption of immigration processing and the Executive

Branch's discretion decidedly outweighs any alleged fiscal harms that the States may

encounter at some point in the future, as well as any inability to provide public comment before termination. Even if those alleged expenditures arising from duly enacted immigration laws establish standing and irreparable harm, they still cannot justify the separation-of-powers implications of such an injunction. Even at final judgment, procedural errors often do not justify undoing a policy. *See, e.g.*, *Central & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000). And the APA's text nowhere suggests that it displaced the necessary equitable inquiry needed to issue injunctive relief, *see Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001), particularly at the preliminary injunction stage.

The equities especially weigh against an injunction here because no one can reasonably dispute that the Title 42 emergency order must end when the public-health justification has ceased, and the States will need to bear any alleged costs arising from the ordinary operation of duly enacted immigration laws—just as they did prior to the public-health emergency order. Given these circumstances, the equities clearly weigh against forcing the government to continue this order simply to delay the order's termination and thereby potentially save the States dollars and cents in the interim.

The district court stated that the burden on the federal government was lessened because Title 42 orders do not apply to all noncitizens and have always contained certain exceptions, such as totality-of-the-circumstances exceptions for humanitarian or law enforcement reasons assessed on a case-by-case basis.

ROA.3849.  But Title 42 orders disrupt immigration processing on a large scale across the entire border and entail a continuing need for diplomatic engagement.

The district court was wrong to assert that this use of injunctive power is in the public interest.  The Supreme Court has stated that the public interest merges with the federal government's interest, *Nken v. Holder*, 556 U.S. 418, 435 (2009), and, as explained, States cannot press *parens patriae* views of the public interest against the federal government.  At a minimum, the government's view of the public interest must be given serious weight.  *Cf. Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("[T]he views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority.").  Moreover, although this Court has concluded that unlawful policies are generally not in the public interest, *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021), likelihood of success on the merits is only one factor at the preliminary injunction stage, where the government's action has not conclusively been determined unlawful.  In addition, the alleged errors are procedural; no one disputes that CDC may lawfully terminate these emergency orders.  Equitable relief is never afforded as a matter of right.  The district court should have recognized the myriad reasons why the public interest counseled against an injunction.

## CONCLUSION

For the foregoing reasons, the Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

BRANDON B. BROWN
*United States Attorney*

SHARON SWINGLE

*s/ Joshua Dos Santos*
JOSHUA DOS SANTOS
*Attorneys, Appellate Staff*
*Civil Division, Room 7224*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-5744*
*Joshua.y.dos.santos@usdoj.gov*

July 2022

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.


*s/ Joshua Dos Santos*
JOSHUA DOS SANTOS

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,952 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Joshua Dos Santos*
JOSHUA DOS SANTOS

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 265..................................................................................................A1

42 C.F.R. § 71.40 ...............................................................................................A2

5 U.S.C. § 553....................................................................................................A5

**42 U.S.C. § 265**

**§ 265. Suspension of entries and imports from designated places to prevent spread of communicable diseases.**

Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

**42 C.F.R. § 71.40**

## § 71.40. Suspension of the right to introduce and prohibition of the introduction of persons into the United States from designated foreign countries or places for public health purposes.

(a) The Director may prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries (or one or more political subdivisions or regions thereof) or places, only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease, by issuing an order in which the Director determines that:

(1) By reason of the existence of any quarantinable communicable disease in a foreign country (or one or more political subdivisions or regions thereof) or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and

(2) This danger is so increased by the introduction of persons from such country (or one or more political subdivisions or regions thereof) or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.

(b) For purposes of this section:

(1) Introduction into the United States means the movement of a person from a foreign country (or one or more political subdivisions or regions thereof) or place, or series of foreign countries or places, into the United States so as to bring the person into contact with persons or property in the United States, in a manner that the Director determines to present a risk of transmission of a quarantinable communicable disease to persons, or a risk of contamination of property with a quarantinable communicable disease, even if the quarantinable communicable disease has already been introduced, transmitted, or is spreading within the United States;

(2) Prohibit, in whole or in part, the introduction into the United States of persons means to prevent the introduction of persons into the United States by suspending any right to introduce into the United States, physically stopping or restricting movement into the United States, or physically expelling from the United States some or all of the persons;

(3) Serious danger of the introduction of such quarantinable communicable disease into the United States means the probable introduction of one or more persons capable of transmitting the quarantinable communicable disease into the

United States, even if persons or property in the United States are already infected or contaminated with the quarantinable communicable disease;

(4) The term Place includes any location specified by the Director, including any carrier, as that term is defined in 42 CFR 71.1, whatever the carrier's flag, registry, or country of origin; and

(5) Suspension of the right to introduce means to cause the temporary cessation of the effect of any law, rule, decree, or order pursuant to which a person might otherwise have the right to be introduced or seek introduction into the United States.

(c) Any order issued by the Director under this section shall include a statement of the following:

(1) The foreign countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons shall be prohibited;

(2) The period of time or circumstances under which the introduction of any persons or class of persons into the United States shall be prohibited;

(3) The conditions under which that prohibition on introduction shall be effective in whole or in part, including any relevant exceptions that the Director determines are appropriate;

(4) The means by which the prohibition shall be implemented; and

(5) The serious danger posed by the introduction of the quarantinable communicable disease in the foreign country or countries (or one or more political subdivisions or regions thereof) or places from which the introduction of persons is being prohibited.

(d) When issuing any order under this section, the Director shall, as practicable under the circumstances, consult with all Federal departments or agencies whose interests would be impacted by the order. The Director shall, as practicable under the circumstances, provide the Federal departments or agencies with a copy of the order before issuing it. In circumstances when it is impracticable to engage in such consultation before taking action to protect the public health, the Director shall consult with the Federal departments or agencies as soon as practicable after issuing his or her order, and may then modify the order as he or she determines appropriate. In addition, the Director may, as practicable under the circumstances, consult with any State or local authorities that he or she deems appropriate in his or her discretion.

(1) If the order will be implemented in whole or in part by State and local authorities who have agreed to do so under 42 U.S.C. 243(a), then the Director

A3

shall explain in the order the procedures and standards by which those authorities are expected to aid in the enforcement of the order.

(2) If the order will be implemented in whole or in part by designated customs officers (including any individual designated by the Department of Homeland Security to perform the duties of a customs officer) or Coast Guard officers under 42 U.S.C. 268(b), or another Federal department or agency, then the Director shall, in coordination with the Secretary of Homeland Security or other applicable Federal department or agency head, explain in the order the procedures and standards by which any authorities or officers or agents are expected to aid in the enforcement of the order, to the extent that they are permitted to do so under their existing legal authorities.

(e) This section does not apply to:

(1) Members of the armed forces of the United States and associated personnel if the Secretary of Defense provides assurance to the Director that the Secretary of Defense has taken or will take measures such as quarantine or isolation, or other measures maintaining control over such individuals, to prevent the risk of transmission of the quarantinable communicable disease into the United States; or

(2) Other United States government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household, if the Director receives assurances from the relevant head of agency and determines that the head of the agency or department has taken or will take, measures such as quarantine or isolation, to prevent the risk of transmission of a quarantinable communicable disease into the United States.

(f) This section shall not apply to U.S. citizens, U.S. nationals, and lawful permanent residents.

(g) Any provision of this section held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this section and shall not affect the remainder thereof or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**5 U.S.C. § 553**

**§ 553. Rule making.**

(a) This section applies, according to the provisions thereof, except to the extent that there is involved--

    (1) a military or foreign affairs function of the United States; or

    (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--

    (1) a statement of the time, place, and nature of public rule making proceedings;

    (2) reference to the legal authority under which the rule is proposed; and

    (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply--

    (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

    (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except--

    (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

    (2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.